CORRECTED

# In the United States Court of Federal Claims

No. 19-1964C
(Filed August 19, 2024)

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                        *
                                        *
ROBERT L. DOYON,                        *
                                        *
                    Plaintiff,          *
                                        *
        v.                              *
                                        *
THE UNITED STATES,                      *
                                        *
                    Defendant.          *
                                        *
                                        *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Michael Clemente*, *Jordan R. Goldberg*, and *Dean W. Baxtresser*, Latham & Watkins LLP, and *Eugene Elrod*, Bracewell LLP, all of Washington, D.C., for the plaintiff.

*Elizabeth A. Speck*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for the defendant.

## OPINION & ORDER

**FUTEY**, *Senior Judge*

### I.    Introduction

This military pay case has been ongoing since December 27, 2019.  Pl.'s Compl., ECF No. 1.  Plaintiff Mr. Robert L. Doyon served in the United States Navy during the Vietnam War and was separated therefrom for unsuitability upon being diagnosed with personality disorder(s).  *Id.* at 1.  He challenges the propriety of his separation and alleges he actually developed then-unrecognized Post-Traumatic Stress Disorder (PTSD) that was twice misdiagnosed as a personality disorder.  *Id.* at 9–12.  In turn, Plaintiff alleges he should have been medically retired by the Navy.  *Id.* at 12.  He petitioned the Board for Correction of Naval Records (BCNR) to that end and, upon failing to obtain the relief he sought, filed suit in this Court.

*Id.* at 3–4.  The Court ruled in the Government's favor, *Doyon v. United States*, No. 19-1964C, 2021 WL 120923, at *14 (Fed. Cl. Jan. 13, 2021), but that decision was vacated by the U.S. Court of Appeals for the Federal Circuit, *Doyon v. United States*, 58 F.4th 1235, 1237 (Fed. Cir. 2023).  Plaintiff's case was remanded to this Court with certain instructions by the Federal Circuit.  *Id.*  Upon joint motion by the parties, ECF No. 38, the Court remanded to the BCNR, Order (May 9, 2023), ECF No. 39.  Upon again failing to obtain relief by petitioning the BCNR, *see* ECF No. 43, Plaintiff persisted with litigation against the Government before this Court, Pl.'s Am. Compl., ECF No. 48.  At issue now are Plaintiff's motion for judgment on the administrative record, ECF No. 49, and the Government's cross-motion, ECF No. 52.  In his motion, Plaintiff seeks to invalidate the BCNR's decision on remand as arbitrary and capricious, and also requests that the Court grant him certain equitable relief, including record correction to reflect medical retirement by the Navy and the benefits associated with it.  ECF No. 49 at 40.  The Government request that the Court deny Plaintiff's prayer for relief and uphold the BCNR's decision.  ECF No. 52 at 18.  In the event the Court finds the BCNR's decision to be arbitrary and capricious, the Government seeks remand.  *Id.* at 41.

## II.   Background

### A.  *Plaintiff's Separation*

Plaintiff served in the Navy between March 17, 1966 and November 21, 1968, primarily aboard the U.*S.S. Intrepid*, a storied aircraft carrier that is now decommissioned and permanently docked in New York City as the centerpiece of the Intrepid Museum.  Supp. A.R., ECF No. 45 at SA0132, SA0260–61.

He states that, during his service, he witnessed the *U.S.S. Forrestal* fire on July 29, 1967, in which 134 Navy servicemembers (Sailors) perished and 161 were injured.  *Id.* at SA0252–53.[1]  Furthermore, he states that he maintained friendships with two of the "Intrepid Four," a group of Sailors who deserted the ship in protest of the Vietnam War on October 23, 1967.  *Id.* at SA0253.  Those Sailors fled to the Soviet Union with assistance from Japanese anti-war activists and were ultimately granted asylum by Sweden.  *Id.*  Inter alia, Plaintiff maintains he was shunned and harassed by shipmates during his service owing to his actual or perceived affiliation with the Intrepid Four as well as his fraternization with Black Sailors against the backdrop of racial bigotry displayed by many White Sailors of the day.  *Id.* at SA0253–54.  He states that certain shipmates threatened to kill him.  *Id.* at SA0254.

---

[1] Plaintiff also refers to the *U.S.S. Oriskany* fire on October 26, 1966, although it is less clear to what extent he states he was an eyewitness thereto.  Supp. A.R., ECF No. 45 at SA0206.

Plaintiff was absent without leave between and including May 18 and May 20, 1968. *Id.* at SA0026, SA0244. He received non-judicial punishment (NJP) for the latter unauthorized absence (UA). *Id.*

On August 15, 1968, Plaintiff underwent a medical evaluation by the *U.S.S. Intrepid* Medical Officer upon being referred by his command owing to "his inability to get along with his peers, his recent mental agitation and deteriorating work habits, and his expression of admiration for" the Sailors who had deserted the ship, that is, the Intrepid Four. *Id.* at SA0270. The Officer who initially evaluated Plaintiff emphasized the role of Plaintiff's personal opposition to the Vietnam War in the mental deterioration he exhibited. *Id.* Plaintiff was admitted to the psychiatric ward at Naval Hospital Subic Bay (NHSB) in the Philippines on August 16, 1968 for further observation and evaluation. *Id.* at SA0272–73. The NHSB Chief of NP Service diagnosed him with passive-aggressive personality disorder pursuant to the Second Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-II).[2] *Id.* On or after August 30, 1968, Plaintiff was, however, returned to full duty owing to the Chief of NP Service concluding Plaintiff was capable of readjustment. *Id.* at SA0273.

Plaintiff states that, on September 23, 1968, he witnessed the deaths of two Sailors in a gruesome airplane crash, one of whom was his friend. *Id.* at SA0009. In the course of providing other details of what he witnessed, Plaintiff recounts his friend's "body was never recovered, but his legs were sent to the [r]eefers, to later be sent home to his family." *Id.* at SA0254.

On September 26, 1968, Plaintiff received notice that he was being considered for administrative separation due to his earlier diagnosis at the NHSB psychiatric ward. *Id.* at SA0278. On September 30, 1968, the *U.S.S. Intrepid* Commanding Officer recommended Plaintiff's separation for unsuitability to the Chief of Naval Personnel in view of his passive-aggressive personality diagnosis. *Id.* at SA0277. Plaintiff underwent a second psychiatric evaluation in accordance with Bureau of Naval Personnel Manual (BUPERSMAN) Article C-10310. *Id.* at SA0277, SA0280. Upon evaluation, he was diagnosed with emotionally unstable personality disorder with noted paranoid traits by a clinical psychologist and psychiatrist at the Naval Station Treasure Island (NSTI) Neuropsychiatric Clinic on

---

[2] There is some confusion regarding this mental health provider's title. He identified himself as the "Chief of NP Service," *id.* at SA0273, but is mostly referred to as the "Chief of Neuropsychiatric Services" by the Board for Correction of Naval Records (BCNR), *e.g.*, *id.* at SA0007. Elsewhere, he is apparently referred to as the "Chief of Neuropsychiatry," *id.* at SA0012, and "Chief of Neuropsychology," *id.* at SA0013. Even if the latter is a typographical error, it is still unclear if "NP" is an abbreviation of "Neuropsychiatric" or "Neuropsychiatry." Therefore, the Court simply uses "Chief of NP Service" herein except when quoting the BCNR.

October 28, 1968. *Id.* at SA0280. The two providers deemed administrative separation for unsuitability appropriate under BUPERSMAN Article C-10310. *Id.* Consequently, on November 21, 1968, Plaintiff was administratively separated from the Navy for unsuitability rather than being medically retired. *Id.* at SA0008.

In response to a good offices inquiry regarding Plaintiff's separation by the late Senator Edward M. Kennedy, on December 20, 1968, Rear Admiral Norris, Assistant Chief of Personnel, explained that "[d]uring the course of hospitalization, [Plaintiff] exhibited a personality best described as a passive-aggressive type. This is not a mental illness, but a personality defect acquired during the formative years. As such, it pre-existed his entry into the Naval Service and made his adjustment to the Naval Service difficult." *Id.* at SA1323.

### B. *Post-Separation Developments*

Post-separation, Plaintiff enrolled in a Bachelor of Fine Arts program at the University of Massachusetts Amherst but left it prematurely. *Id.* He states the latter decision was spurred by anguish following the suicide of a close friend from the Navy. *Id.*

In 1980, the American Psychiatric Association officially recognized PTSD as a diagnosable disorder in the Third Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III), which was published that year. *Id.* at SA0027.

On July 20, 2013, Plaintiff was evaluated by a Department of Veterans Affairs (VA) psychiatrist and provisionally diagnosed with Anxiety (Not Otherwise Specified) and Depressive Disorder (Not Otherwise Specified) pursuant to the Fifth Edition of the DSM (DSM-V). *Id.* at SA0008. Plaintiff filed an Application for Disability Compensation and Related Compensation Benefits with the VA later that year, claiming PTSD as well as "Passive-Aggressive" Diagnosis NP Evaluation, "Unsuitability," and "Personality Disorder" among his disabilities. *Id.* at SA0402. On June 11, 2014, Plaintiff underwent a Compensation and Pension (C&P) Examination by the VA. *Id.* at SA0265–73.

In her "C&P Examination Note," Dr. Gayani K. Leonard, a psychiatrist, identified "Witness to a plane crash and a ship accident with multiple casualties" as "Stressor #1" (the sole stressor listed), *id.* at SA0315, and, applying the diagnostic criteria for PTSD, determined Plaintiff met the DSM-V criteria for PTSD whereas he "developed PTSD symptoms soon after the plane crash, starting with nightmares per his history . . . related to the stressors of the plane crash and the ship accident that he was a witness to," *id.* at SA0319. Dr. Leonard expressly did not incorporate Plaintiff's belief in a conspiracy against him during his service in the Navy in the PTSD diagnosis. *Id.* She noted Plaintiff "states that after his friends deserted, he

felt alienated and lonely.  He states that he was huffing Trichloroethylne [sic] and tried to kill himself."[3]  *Id.* at SA0314.

Plaintiff was granted service-connection for PTSD (with alcohol use disorder) with a 50 percent disability rating, effective December 9, 2013, on September 16, 2014.  *Id.* at SA0009.  He was again diagnosed with PTSD following a second C&P Examination by the VA on October 21, 2015.  *Id.* at SA0404.  The latter diagnosis was made by Dr. Kelly A. Gorman, a clinical psychologist, in conjunction with diagnoses of "Alcohol Use Disorder; Moderate in sustained remission" and "Cannabis Use Disorder; Moderate in sustained remission."  *Id.* at SA0404–05.  In turn, the VA increased his disability rating to 70 percent, effective August 27, 2015, on November 18, 2015.[4]  *Id.* at SA0026.

### C. *Plaintiff's Initial Petition*

On September 14, 2017, Plaintiff submitted a petition to the BCNR "requesting that his naval record be corrected to: (1) show that he was medically retired pursuant to BUPERSMAN C-10305 . . . ; (2) show that he was found unfit and medically retired for psychoses or psychoneuroses; and (3) remove the reference to "BUPERSMAN C-10310, SPN" from his DD Form 214."[5]  *Id.* at SA0009 (footnote omitted).  Accordingly, Plaintiff argued he was misdiagnosed with personality disorder(s) whereas he had *instead* developed then-unrecognized PTSD while serving in the Navy, which should deem him eligible for retroactive medical retirement pursuant to BUPERSMAN C-10305.  *Id.* at SA0071–93.  Among the exhibits appended to the petition was a 2004 medical article titled "Assessment and Management of Personality Disorders" by Dr. Randy K. Ward, restating that "[p]ersonality disorders are characterized by chronic patterns of inner experience and behaviors that are inflexible and present across a broad range of situations"

---

[3] Dr. Leonard's note, thereafter, recounts "[t]here was another incident where [Plaintiff] was recording and saw an a [sic] plane crash and saw the pilot die.  He states nightmares started after this.  [H]e also saw a ship sinking where they had 135 body bags brought over to their ship."  *Id.* at SA0315.  At oral argument, Plaintiff's counsel stressed Plaintiff attempted "to commit suicide . . . before the nightmares related to the plane crash."  Tr., ECF No. 67 at 48.

[4] At oral argument, Plaintiff's counsel stated he is "either 75 percent or 100 percent disabled right now with the VA."  ECF No. 67 at 17.

[5] There is some lack of clarity as to whether the plural or singular forms of these nouns are preferred, *i.e.*, "psychoses" or "psychosis" and "psychoneuroses" or "psychoneurosis."

and "diagnosis of a personality disorder is based on the patient's behavior over time in a variety of situations."[6]  *Id*. at SA0412–13.

Alongside several other materials, certain affidavits were appended as exhibits.  *Id*. at SA0095–96.  Notably, in his affidavit, Plaintiff's brother, Mr. Richard Doyon, states, based on his firsthand experience, that his "brother Bob was a normal, healthy young man, with no drug or alcohol history, prior to his Navy enrollment [sic]" whereas "[w]hen he returned home from the Navy, he was a changed man and his family has watched him over many years suffer with depression, loneliness, and self-doubt.  He was not the young man I had known and had grown up with."  *Id*. at SA0445.  Plaintiff's brother elaborated extensively on the foregoing.  *Id*. at SA0445–49.

Appurtenant to his petition, Plaintiff had undergone an additional psychiatric evaluation conducted by Dr. Ted R. Greenzang, a psychiatrist and expert witness retained by Plaintiff's counsel for a lump sum of $1000.00, on August 7, 2017 via Skype.  *Id*. at SA0422.  Dr. Greenzang stated the evaluation was "independent," conducted "[u]sing generally accepted methods in [his] discipline," and that he held them "to a reasonable degree of medical certainty."  *Id*. at SA0421. He concluded Plaintiff:

> was subjected to two highly traumatic incidents during the course of his tour of duty.  He stated in late 1967 or early 1968, he observed a fire on another aircraft carrier, the USS Forrestal.  He stated planes were armed and ready to launch when an accident occurred on deck. He witnessed a fire which resulted in 135 individuals dying.  He stated body bags were bought [sic] to the Intrepid by chopper.  He felt traumatized and realized that such an incident could happen at any time.
>
> In early August 1968, he was exposed to a markedly traumatic incident while on the Intrepid.  He stated an accident occurred on the flight deck of the ship.  A plane struck another sailor in the chest. That individual was thrown into the water.  Both he and the pilot of the plane were killed.  He stated that he witnessed the incident from about 30 feet away.  As the incident was being studied, he watched a video of it multiple times.  He stated the incident became burned in his head.  He could not sleep.  He continues to visualize that incident to the present day.  He experienced nightmares with violent themes.  He

---

[6] The DSM-II itself established that personality disorders are characterized by "life-long patterns, often recognizable by the time of adolescence or earlier."  ECF No. 45 at SA1094.

thought ruminatively about the accident. He stated that became a lightning rod for what he had been experiencing for more than a year.

*Id.* at SA0432–33.

He further mentioned that Plaintiff stated he was treated caustically, that is, humiliated, insulted, and physically ejected from an office by a religious minister (chaplain) he sought consolation from shortly after the airplane crash. *Id.* at SA0433. Plaintiff himself described the latter incident in his writings, attributing the chaplain's hostility to Plaintiff's articulation of anti-war sentiment rooted in his religious background. *Id.* at SA0255.

Dr. Greenzang reviewed Plaintiff's medical history up to the date of the evaluation he conducted and opined "the medical evidence that has been presented indicates that [Plaintiff] in fact was manifesting a PTSD at the time of his discharge from the military in 1968." *Id.* at SA0433. Additionally, "[h]is history indicates that within reasonable medical probability, his discharge from the military was precipitated directly by the highly traumatic incident in which he witnessed two sailors being killed." *Id.* at SA0435.

Furthermore, he opined Plaintiff's "history is not consistent with a diagnosis of a personality disorder. He had no history of having received mental health treatment during his youth. He had no problems related to use of alcohol or illicit substances which preceded his military duty. He had no history of having experienced any legal difficulties prior to his military service." *Id.* Dr. Greenzang went on to describe the normalcy of Plaintiff's formative years, per his professional ascertainment, *id.*, partly relying on the affidavits of Plaintiff's brother and classmate Richard Neumaier, *id.* at SA0431.

He also concluded Plaintiff's "symptomatology is clearly consistent with what was diagnosed to be a psychoneurosis at the time of the incidents in question in 1968" and Plaintiff "should have been found to be "unfit" pursuant to C-10305 due to a prominent psychoneurosis at the time of the incident in question, which by today's nomenclature would be classified as PTSD." *Id.* at SA0436.

Unfavorable disposition of Plaintiff's petition by the BCNR ultimately gave rise to the litigation at bar.

In reviewing Plaintiff's petition, the BCNR requested an advisory opinion (AO) from the Senior Medical Advisor (SMA) to the Council of Review Boards. *Id.* at SA0010. The AO, provided on September 20, 2018, "recommended that [Plaintiff]'s request for relief be denied," citing the fact "he had been diagnosed at different times with Passive Aggressive Personality and Emotionally Unstable Personality" and observing "there was no indication [] that [Plaintiff] ever complained of symptoms directly related to the [*U.S.S. Forrestal*] fire or the plane

crash onboard the [*U.S.S. Intrepid*] in October 1968." *Id.* Additionally, the AO remarked that Plaintiff "demonstrated problems adjusting to the Navy prior to either of these traumatic events" and "acknowledged the notice of his administrative separation on 26 September 1968, just three days after the [] plane crash." *Id.* Lastly, the AO concluded "that neither psychoses nor psychoneuroses [under Directive 1332.18] . . . appear to have applied to [Plaintiff]'s clinical presentation at the time" whereas the foregoing are regarded as analogous to PTSD, which was not recognized in the DSM-II. *Id.* Nonetheless, the AO acknowledged Plaintiff's "later diagnosis with PTSD." *Id.*

On November 2, 2018, Plaintiff, "through counsel, provided a rebuttal to the AO," describing it as "arbitrary and capricious" owing to its "reliance upon the fact that [Plaintiff] was placed on academic probation prior to his enlistment" and "disputed the characterization of [Plaintiff]'s service in the Navy prior to his exposure to traumatic event [sic]." *Id.* Furthermore, Plaintiff assailed the thoroughness of the SMA's review of his medical records and the AO's failure to apply liberal consideration to the underlying application pursuant to 10 U.S.C. § 1552(h) and Department of Defense (DoD)-promulgated guidance, *i.e.*, the Kurta Memo. *Id.* at SA0010–11.

On November 8, 2018, the BCNR denied the crux of the relief requested by Plaintiff, principally citing the AO. *Id.* at SA0011. It "found insufficient evidence of unfitness for continued naval service due to psychosis or psychoneurosis in [Plaintiff]'s naval records" and "was [] not persuaded by the VA's subsequent disability ratings for PTSD in 2017, finding them to be too distant in time from 1968 to be probative of [Plaintiff]'s fitness for continued naval service in 1968." *Id.* Moreover, the BCNR found "the 1968 diagnosis to be more credible than the psychiatric evaluation conducted . . . in 2017 since the former was based upon personal observations made by mental health professionals during the time period in question rather than the review of medical records and [Plaintiff]'s personal assertions made more than 40 years after the fact." *Id.* The BCNR did not apply liberal consideration in reaching such conclusions.

D. *Litigation Developments*

On December 27, 2019, Plaintiff filed his initial complaint in this Court, alleging alleging "[t]he BCNR's decision was arbitrary, capricious, an abuse of discretion, unsupported by evidence and contrary to law." ECF No. 1 at 3. Principally, Plaintiff argued "[t]he BCNR's reasoning that [Plaintiff]'s PTSD diagnoses were "too distant in time from 1968 to be probative" was antithetical to" the Kurta Memo's mandate that liberal consideration be given to such petitions. *Id.* at 22. After the case was fully briefed, on January 13, 2021, the Court held "[t]he administrative record [] shows that the BCNR complied with applicable law in considering Plaintiff's application to correct his military records and that the

BCNR's decision to deny Plaintiff's application was reasonable and supported by substantial evidence." *Doyon*, 2021 WL 120923, at *14.

Plaintiff then appealed to the Federal Circuit.  On January 25, 2023, the Circuit held that "[b]ecause [Plaintiff] challenges the correctness of the narrative reason for his discharge, as stated in his military records, and because both 10 U.S.C. § 1552(h) and a Department of Defense memorandum (Kurta Memo) require liberal consideration for such correction requests, the [] Court erred in holding that the liberal consideration standard does not apply to [Plaintiff]'s petition." *Doyon*, 58 F.4th at 1237.  It vacated the decision below and remanded the case "with instructions to afford [Plaintiff]'s application liberal consideration." *Id*.  In discussing the issues, it remarked that, "[a]lthough this case is narrowly about correcting [Plaintiff]'s military records to reflect a discharge due to PTSD instead of a personality disorder, there is a larger underlying dispute about whether [Plaintiff] was unfit, rather than unsuitable, for service at the time of his discharge from the Navy." *Id*. at 1248.  The Circuit concluded "[t]his unfitness dispute between the parties is not properly before us at this stage and can be addressed, if necessary, on remand." *Id*.  Thereafter, the parties jointly moved for secondhand remand of the case by the Court to the BCNR, ECF No. 38, which the Court granted, ECF No. 39.

Subsequently, in a decision on remand, dated October 31, 2023, in which it maintains liberal consideration was applied to Plaintiff's petition, the BCNR "found no error or injustice in [Plaintiff]'s discharge for unsuitability due to his diagnosed personality disorder(s) at the time that it was administered."  ECF No. 45 at SA0012.  It did concede that there was "an injustice in that [Plaintiff]'s DD Form 214 continues to make reference to a reason and authority for separation which can be traced back to his diagnosed personality disorder, as this reference unnecessarily requires [Plaintiff] to disclose private and potentially embarrassing personal medical information whenever he has reason to prove his otherwise honorable service." *Id*.  Regardless, it concluded "[t]here was no error or injustice in [Plaintiff]'s discharge for unsuitability due to a personality disorder." *Id*.

The BCNR reasoned "[t]he most compelling evidence that [Plaintiff] had a personality disorder was the diagnosis of passive aggressive personality which [sic] rendered by the Chief of Neuropsychiatry upon his discharge from the NHSB psychiatric ward on 30 August 1968.  The [BCNR] presumes that the NHSB's Chief of Neuropsychiatric Services, a Lieutenant Commander in the [United States Navy Reserve] Medical Corps, was qualified to render such a diagnosis." *Id*. at SA0012–13.  It elaborated that, "contrary to [Plaintiff]'s contentions, the behaviors which informed this diagnosis were evident prior to his reported trauma exposure events." *Id*. at SA0013.  It stressed that "[w]hile [Plaintiff's] work performance was rated as "adequate," it met only the bare minimum standards and his difficulty adjusting to the Navy was so apparent that it was noted on multiple occasions." *Id*.  In support of the latter conclusion, it emphasized Plaintiff "joined the Navy only after he was about to be placed on academic probation" as evidence of Plaintiff's "similar conflicts

with other organizations prior to his enlistment" while conceding there are, in fact, alternative explanations for poor academic performance at a given time. *Id.* at SA0008, SA0013. The BCNR drew attention to the fact "[Plaintiff] described himself as "a person who has always turned the other cheek and has always backed away from any fights or even talking back to people." This statement provided a specific example of direct interaction with [Plaintiff] feeding the personality disorder diagnosis." *Id.* at SA0013. That is, "mental health professionals drew a parallel between [Plaintiff]'s pre-service academic difficulties and his difficulty adjusting to life in the Navy." *Id.* The BCNR "also note[d] that [Plaintiff] reported in June 2014 that he dropped out of school after being discharged from the Navy because he did not want to do what the teachers wanted as he disagreed with his teachers" whereas Plaintiff now maintains his friend's suicide, in fact, drew him to withdraw from the University of Massachusetts Amherst. *Id.* at SA0008, SA0013.

Supplementally, the BCNR concluded "[t]he personality disorder diagnosis rendered by the NHSB Chief of Neuropsychology [sic] was corroborated by the diagnosis rendered by the clinical psychologist and psychiatrist at NSTI who diagnosed him with an emotionally unstable personality two months later." *Id.* at SA0013. The BCNR "ultimately found the difference between" Plaintiff's initial diagnoses of passive-aggressive personality disorder and emotionally unstable personality disorder with noted paranoid traits "to be irrelevant, as either would have provided a valid basis for [Plaintiff] to be involuntarily separated for unsuitability due to a personality disorder." *Id.* at SA0014.

It also concluded Plaintiff "was diagnosed with a personality disorder before any of his PTSD symptoms began to manifest." *Id.* While "[b]oth the VA mental health provider" and Dr. Greenzang "suggested that [Plaintiff]'s PTSD symptoms began to manifest after he witnessed the plane crash . . . on 23 September 1968," the latter incident took place "more than three weeks after he had already been diagnosed with the passive-aggressive personality disorder." *Id.* Hence, the BCNR held that because Plaintiff's "PTSD symptoms had not yet manifested as of 30 August 1968, they could not have been confused for a personality disorder." *Id.*

The BCNR acknowledged Dr. Greenzang's conclusion Plaintiff's "history was not consistent with a diagnosis of a personality disorder" but held Plaintiff's initial personality disorder diagnoses "to be more reliable than the evaluation provided by someone paid to provide an opinion with no professional obligation for [Plaintiff]'s case [sic] and based upon a single interview and review of records nearly 50 years after the fact." *Id.* Dr. Greenzang, the BCNR concluded, "ignor[ed] the opinions of the three fully qualified mental health professionals who had direct interaction with [Plaintiff] during the relevant time period in 1968." *Id.*

The BCNR noted Plaintiff "included his diagnosed passive-aggressive personality disorder on his claim for disability compensation" while conceding Plaintiff "is not a trained mental health professional." *Id.* at SA0015.

Additionally, the BCNR concluded Plaintiff's VA "evaluations were conducted in the context of a C&P examination intended only to confirm or refute the [Plaintiff]'s claimed PTSD condition. These were not holistic mental health assessments intended to provide treatment and/or to identify every potential condition" while the fact Plaintiff "was medically cleared for enlistment" had "no relevance" because "[a]n enlistment physical could not possibly identify the existence of any personality disorders not reported by the enlistee." *Id.*

Lastly, the BCNR concluded "[t]here is no evidence in the record that [Plaintiff] ever experienced a single psychotic episode while in the Navy, much less recurrent psychotic episodes" and that there was "insufficient evidence . . . to find that [Plaintiff] should have been diagnosed with psychoneuroses during his naval service." *Id.* at SA0017–18. The administration of Thorazine to Plaintiff in 1968 by mental health providers was ascertained to have been "in only small doses for the purpose of sedating [him], rather than to treat him for any psychosis." *Id.* Regarding psychoneurosis (alternatively, "psychoneuroses"), inter alia, the BCNR cited Plaintiff's underlying personality disorder(s) as preemptive of such a diagnosis whereas there was no indication Plaintiff "experience [sic] severe persistent or recurrent symptoms requiring hospitalization or the need for continuing psychiatric support" during the pertinent time period. *Id.* at SA0018.

The BCNR conceded Plaintiff's "PTSD condition did potentially contribute indirectly to the circumstances of his discharge" but stated that Plaintiff's personality disorder diagnoses and his PTSD diagnosis are concurrently presumed to be accurate. *Id.* at SA0019. It justified the foregoing conclusion by underscoring that a contemporary PTSD diagnosis does not automatically amount to unfitness and entitlement to medical separation or retirement. *Id.* at SA0020. To some degree, per the BCNR, the same can be said of psychosis and psychoneurosis. *Id.* Fitness and suitability are, per the BCNR, distinct terms of art in the military pay context. *Id.* at SA0020–21. In view of the ascertained propriety of his personality disorder(s), it concluded Plaintiff was unsuitable, but remained fit, *e.g.*, he "was performing his duties in a presumably effective manner on the flight deck of the [*U.S.S. Intrepid*] on 23 September 1968, just three days before his administrative separation for unsuitability was initiated . . ." *Id.* at SA0021.

On December 6, 2023, Plaintiff notified the Court that the BCNR's decision on remand "does not provide a satisfactory basis for disposition of this case, and that further proceedings before this Court are required" pursuant to Rule 52.2(e)(1) of the Rules of the U.S. Court of Federal Claims (RCFC). ECF No. 44 at 1.

On December 21, 2023, the Government submitted the supplemented administrative record to the Court.[7]  ECF No. 45.

In accordance with a scheduling order issued by the Court on January 4, 2024, ECF No. 46, Plaintiff filed an amended complaint on January 12, 2024. Therein, he restates that "[t]he United States Navy wrongfully stigmatized and denied benefits [allegedly owed to him] by misattributing his post-traumatic stress disorder ("PTSD") symptoms to a preexisting personality disorder during the process of separation[,]"  ECF No. 48 at 1.  Plaintiff alleges that the BCNR "compounded this error by twice denying [his] application to correct his military records to reflect that he was medically retired as a result of PTSD acquired during service, rather than discharged as unsuitable because of an allegedly preexisting personality disorder."  *Id.*  Plaintiff elaborates that the BCNR erred by:

(1) "[E]rroneously affirm[ing] that [Plaintiff] "was properly diagnosed with a personality disorder," disregarding that [Plaintiff]'s symptoms do not match the diagnostic criteria for such a disorder, that the Navy itself did not find evidence of such a disorder upon his enlistment, and that no medical professional since 1968 has ever agreed with that diagnosis—which is by definition a "life-long" condition."  *Id.* at 4.  Elaborating, Plaintiff alleges the BCNR "(1) ignored all record evidence regarding [Plaintiff]'s lack of any signs of a personality disorder before enlistment; (2) failed to grapple with, much less apply, the clinical definition of personality disorder to the facts of [Plaintiff]'s case; (3) discounted an expert opinion concerning Plaintiff's mental health, and (4) gave "dispositive weight to two (inconsistent) diagnoses from 1968, at a time when PTSD was unknown and misunderstood—all to conclude that [Plaintiff] was correctly diagnosed with a personality disorder."  *Id.* at 27.

(2) "[I]gnoring [the Federal Circuit's] holding and conclud[ing] that much of the Kurta Memo's framework applies only to corrections related to misconduct— and then [] [going] on to defy several other key tenets of liberal consideration and the Kurta Memo."  *Id.*

*and*

(3) Making "key legal errors in concluding that," notwithstanding service-connected PTSD existing, "such PTSD did not warrant [Plaintiff]'s medical retirement in 1968.  Specifically, it ignored the Kurta Memo's requirement

---

[7] The BCNR's decision on remand concerning Plaintiff's petition, which is at bar, was filed as a distinct CM/ECF docket entry, ECF No. 43, and as part of the supplemented administrative record, ECF No. 45 at SA0001–23.

that the [BCNR] resolve doubt between two possible diagnoses . . . in favor of the one that could lead to relief." *Id.* at 4–5.

In his prayer for relief, Plaintiff requests that the Court "[o]rder that Plaintiff's military records be corrected to show that he was medically retired with a disability rating of no less than 50%[,]" "[r]etroactively assign Plaintiff all the rights and benefits afforded a member of the United States Navy who was medically retired in 1968 in accordance with 10 U.S.C. § 1201 and applicable law including military disability retirement pay, Tricare, health insurance premiums that would have been covered with Tricare, lapsed educational benefits[,]" "[a]ward Plaintiff interest, costs, and attorneys' fees[,]" and "[g]rant such other relief as the Court deems just and proper." *Id.* at 34–35.

Plaintiff moves for judgment on the extant administrative record pursuant to RCFC 52.1. ECF No. 49. He concludes the latter motion, filed on February 9, 2024, by arguing "[t]he Court should grant [his] motion for judgment on the supplemented administrative record, order correction of his service records to reflect that he was medically retired with a 70% disability rating, order the United States to award him back pay and other retirement benefits, and order such other or additional relief as this Court deems just and proper." *Id.* at 40.

In its cross-motion for judgment on the administrative record, filed on March 25, 2024, the Government maintains "[s]ubstantial record evidence supports the [BCNR]'s conclusion that [Plaintiff] was properly separated in 1968 for a personality disorder and was fit for duty at that time." ECF No. 52 at 18. Namely, "[a]pplying the presumption of regularity, the [BCNR] found no reason to doubt [a then-involved mental health] provider's diagnosis," preceding Plaintiff's separation. *Id.* at 19. The Government draws attention to the BCNR's reliance on "additional, objective evidence" suggesting a personality disorder, including the December 20, 1968 letter discussing Plaintiff's behavior, Plaintiff's "demonstrated dissatisfaction with the Navy pre-dating his reported trauma exposure events, as documented in his March 1967 performance evaluation" and Plaintiff's "conflicts with multiple organizations prior to his enlistment." *Id.* at 19–20. The Government also underscores the allegedly corroborating diagnosis pertaining to Plaintiff two months after his initial diagnosis and personality disorder symptoms predating the traumatic event after which Plaintiff's PTSD symptoms apparently began to manifest (the September 23, 1968 airplane crash). *Id.* at 20–21. The Government states that "[i]f the Court were to find that the BCNR's decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law, remand is the proper remedy." *Id.* at 41.

Additionally, the Government argues "[n]othing in section 1552(h), the Kurta Memo, *Doyon* [], or any other DoD guidance [] requires the BCNR to apply liberal consideration to [Plaintiff]'s separate and statutorily distinct request for a disability retirement—or to a determination of fitness, which is a statutory and

regulatory prerequisite for such retirement." *Id.* at 26 (citing 10 U.S.C. § 1201(a)). That is, assuming that Plaintiff "had PTSD at the time of his discharge, [he] failed to demonstrate that he was unfit to perform his duties" whereas suitability and fitness are asserted to be distinct terms of art. *Id.* at 29.

As of April 24, 2024, Plaintiff counters that, under the Federal Circuit's decision, liberal consideration applies to his request for a disability retirement and the associated issue of determining fitness at the time of separation. Pl.'s Reply, ECF No. 53 at 4–9. Per Plaintiff, substantial evidence does not support a finding that Plaintiff "had a personality disorder before or during his time serving in the Navy—and there is in fact significant evidence to the contrary." *Id.* at 11. Plaintiff was allegedly "experiencing PTSD *at least* as of August 15, 1968—and in any event, well before his personality-disorder diagnosis" per the evidence at bar. *Id.* at 20 (emphasis in original). Plaintiff maintains "[t]here is no difference between what the Navy found in 1968 (that Mr. Doyon's mental health "disorder" rendered him "incapable of serving adequately") and what was needed to find that Mr. Doyon was unfit and so entitled to disability retirement." *Id.* at 21–22.

The crux of the Government's reply to the latter, filed on May 22, 2024, is that Plaintiff's contention that his having PTSD in 1968 means "he was *necessarily* unfit for duty and entitled to a disability retirement" is contradicted by pertinent DoD guidance on such determinations. ECF No. 56 at 1 (emphasis in original) (quoting ECF No. 45 at SA0151). What's more, per the Government, "nothing in *Doyon* [] required the [BCNR] to apply liberal consideration in making a fitness for duty determination" as opposed to the narrative reason on a former servicemember's DD Form 214. *Id.* at 2. In support of the foregoing, the Government appended an April 4, 2024 memorandum by Acting Under Secretary of Defense for Personnel and Readiness Ashish S. Vazirani (Vazirani Memo), which establishes, "in light of" the Federal Circuit's opinion in *Doyon*, that "[i]t is DoD policy that the application of liberal consideration does not apply to fitness determinations, an entirely separate Military Department . . ." *Id.*, Ex. 1.

In a supplemental brief filed on June 27, 2024, the filing of which was permitted by leave of this Court, Order (June 10, 2024), ECF No. 61, Plaintiff argues the Court should disregard the Vazirani Memo, not least because it cannot be reconciled with the Federal Circuit's holding in *Doyon*, Pl.'s Resp. to the Government's Citation of Purported Supp. Auth., ECF No. 65 at 2.

The Court heard oral argument by the parties on July 12, 2024. Plaintiff's counsel argued, "the [Federal Circuit in *Doyon*] squarely held that the BCNR must apply liberal consideration not just as to whether it misattributed his discharge to unsuitability and a personality diagnosis, but also if they did that instead of unfitness based on PTSD-related disability." Tr., ECF No. 67 at 8. Plaintiff's counsel further argued that "[*Valles-Prieto*] and [*LaBonte*] both read the Federal Circuit's decision as requiring liberal consideration to the question of whether you

- 14 -

correct this discharge record to make sure that the member should have been discharged as unfit with disability retirement." *Id.* at 9 (citing *Valles-Prieto v. United States*, 159 Fed. Cl. 611 (2022); *LaBonte v. United States*, 43 F.4th 1357 (Fed. Cir. 2022)). The Government's counsel countered, arguing that, "specifically at page 1248, the [Federal Circuit in *Doyon*] expressly declined to rule on whether a change to the narrative code to reflect PTSD would render [Plaintiff] unfit." *Id.* at 38. On rebuttal, Plaintiff's counsel, inter alia, asserted that, in any event, "the narrative reasoning for [Plaintiff]'s discharge [] necessarily includes the underlying factual determinations." *Id.* at 51.

### III. Legal Standards

#### A. *Liberal Consideration*

As the Federal Circuit discussed in *Doyon*, 10 U.S.C. § 1552(h) and the Kurta Memo most pertinently govern liberal consideration in the case at bar. 58 F.4th at 1237.

The statute establishes that:

[i]n the case of a former member of the armed forces whose claim under this section for review of a discharge or dismissal is based in whole or in part on matters relating to post-traumatic stress disorder . . . as supporting rationale, or as justification for priority consideration, and whose post-traumatic stress disorder . . . is related to combat, a board . . . shall . . . review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant and review the claim with liberal consideration to the claimant that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

10 U.S.C. § 1552(h) (cleaned up).

The Kurta Memo specifies, inter alia, that "[e]vidence may [] include changes in behavior; requests for transfer to another military duty assignment; deterioration in work performance; inability of the individual to conform their behavior to the expectations of a military environment; substance abuse; episodes of depression, panic attacks, or anxiety without an identifiable cause; unexplained economic or social behavior changes; relationship issues; or sexual dysfunction." ECF No. 45 at SA2008. Additionally, a "veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service, and that the condition or experience excuses or mitigates the discharge." *Id.* at SA2009. "Absent clear evidence to the

contrary, a diagnosis rendered by a licensed psychiatrist or psychologist is evidence the veteran had a condition that may excuse or mitigate the discharge." *Id.* "A diagnosis made by a licensed psychiatrist or psychologist that the condition existed during military service will receive liberal consideration." *Id.*

Moreover, the Kurta Memo establishes that "[a] determination by the [VA] that a veteran's mental health condition, including PTSD . . . is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service." *Id.* Liberal consideration entails "but is not limited to" the "concepts" that "[s]ome circumstances require greater leniency and excusal from normal evidentiary burdens" and "[i]t is unreasonable to expect the same level of proof for injustices committed years ago when . . . PTSD . . . [was] far less understood than [it is] today." *Id.* at SA2010. "PTSD . . . [is] often undiagnosed or diagnosed years afterwards and [is] frequently unreported." *Id.* at SA2011. "PTSD . . . inherently affect[s] one's behaviors and choices causing veterans to think and behave differently than might otherwise be expected." *Id.* "Reviews involving diagnosed, undiagnosed, or misdiagnosed . . . PTSD . . . should not condition relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case." *Id.* "Veterans with . . . PTSD . . . may have difficulty presenting a thorough appeal for relief because of how [it] has impacted the veteran's life." *Id.* Furthermore, "[s]ervice members diagnosed with . . . PTSD . . . receive heightened screening today to ensure the causal relationship of possible symptoms and discharge basis is fully considered, and characterization of service is appropriate. Veterans discharged under prior procedures, or before verifiable diagnosis, may not have suffered an error because the separation authority was unaware of their condition or experience at the time of discharge. However, when compared to similarly situated individuals under today's standards, they may be the victim of injustice because commanders fully informed of such conditions and causal relationships today may opt for a less prejudicial discharge to ensure the veteran retains certain benefits such as medical care." *Id.*

## B. *APA-Type Review in Military Pay Cases*

"Military pay cases involving decisions of a military correction board and a service member's subsequent entitlement to appropriate monetary compensation under the U.S. Code are reviewed on the administrative record under the same standard as any other agency action." *Sharpe v. United States*, 134 Fed. Cl. 805, 813–14 (2017), *aff'd*, 935 F.3d 1352 (Fed. Cir. 2019) (citing *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006); *Martinez v. United States*, 333 F.3d 1295, 1314–15 (Fed. Cir. 2003)). "The Court may grant a motion for judgment on the administrative record if it determines that a party has met its burden of proof based on the evidence in the record in light of the disputed and undisputed facts." *Lyon v. United States*, 168 Fed. Cl. 520, 524 (2023) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Notwithstanding the absence of a federal

statute mandating the practice, "it has become well established that judicial review of decisions of military correction boards *is conducted under the* [Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A)]." *Keltner v. United States*, 165 Fed. Cl. 484, 501 (2023) (emphasis in original) (quoting *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009)).

   In adjudicating a motion for judgment on the administrative record in a military pay case, the Court "will not disturb the decision of [a military correction board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Bader v. United States*, 97 F.4th 904, 909 (Fed. Cir. 2024) (quoting *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010) (citing *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005))); *see also Riser v. United States*, 97 Fed. Cl. 679, 683–84 (2011). "The *standard* in these cases is broadly referred to as the "substantial evidence" rule." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (emphasis added). Generally, "the distinction between the arbitrary and capricious standard and substantial evidence review is largely semantic[.]" *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1146 n.29 (D.C. Cir. 1980) (alteration in original) (quoting *Pac. Legal Found. v. Dep't of Transp.*, 593 F.2d 1338, 1343 n.35 (D.C. Cir. 1979)) (internal quotation marks omitted). "Arbitrary and capricious" and "substantial evidence" have been distinguished as terms of art in some contexts, *e.g.*, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Camp v. Pitts*, 411 U.S. 138, 141 (1973)), but in the military pay context, "[a]pplication of the arbitrary and capricious standard of review does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence[,]" *Manago v. United States*, 164 Fed. Cl. 424, 434 (2023) (quoting *Heisig*, 719 F.2d at 1157) (cleaned up). That is, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (alteration in original) (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243 (D.C. Cir. 2008))) (internal quotation marks omitted).[8] If APA-type review entails "assuring factual support," then "[t]he "scope of review" provisions of the APA, 5 U.S.C. § 706(2), are cumulative." *Data Processing*, 745 F.2d at 683 (footnote omitted); *cf. Bossenbroek v. Sec'y of Health & Human Servs.*, 169 Fed. Cl. 418, 426 (2024) (quoting *Japanese Found. for Cancer Rsch. v. Lee*, 773 F.3d 1300, 1304 n.3 (Fed. Cir. 2014)) (discussing the nebulous distinction between the terms "abuse of discretion" and "arbitrary and capricious" in the vaccine context). In sum, the standard in this Court's review of military

---

[8] The term is variously restated as "arbitrary, capricious . . .," "arbitrary and capricious" and "arbitrary or capricious."

correction boards' decisions encompasses ascertaining board reliance on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Strand v. United States*, 706 F. App'x 996, 1000 (Fed. Cir. 2017) (quoting *Snyder v. Dep't of the Navy*, 854 F.3d 1366, 1372 (Fed. Cir. 2017)).

Thus, "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and [] courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig*, 719 F.2d at 1156 (footnote omitted). It is settled law that "the military is entitled to substantial deference in the governance of its affairs." *Dodson v. Dep't of the Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (citing *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992)). "The Court does not serve as a super correction board." *Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023) (quoting *Skinner v. United States*, 219 Ct. Cl. 322, 327 (1979)) (internal quotation marks omitted).

"Where a corrections board fails to address contradictory evidence, however, or fails to expressly analyze evidence altogether, the board's decision may be arbitrary and capricious." *Draper v. United States*, 163 Fed. Cl. 284, 290 (2022) (citing *Chisolm v. United States*, 41 F. App'x 394, 402 (Fed. Cir. 2002); *Quinton v. United States*, 64 Fed. Cl. 118, 126 (2005)). A board "must consider all of the relevant evidence in the record, whether or not it supports the challenged conclusion." *Valles-Prieto*, 159 Fed. Cl. at 618 (quoting *Heisig*, 719 F.2d at 1157) (internal quotation marks omitted). Additionally, "[t]he boards for correction of military records may be reviewed for failure to correct plain legal error committed by the military." *Dodson*, 988 F.2d at 1204 (citing *Arens*, 969 F.2d at 1037; *Grieg v. United States*, 226 Ct. Cl. 258, 265 (1981); *Sanders v. United States*, 219 Ct. Cl. 285, 300 (1979)). "[V]iolation of statute, or regulation, or published mandatory procedure, or unauthorized act" may amount to plain legal error. *Id.* (quoting *Skinner*, 219 Ct. Cl. at 333) (internal quotation marks omitted); *see also Bond v. United States*, 47 Fed. Cl. 641, 647–48 (2000) (collecting cases). A "decision is arbitrary and capricious if the board fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the board, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Radziewicz*, 167 Fed. Cl. at 66 (quoting *Royal v. United States*, 160 Fed. Cl. 630, 632–33 (2022)) (internal quotation marks omitted). "The correction board's decision must also be sufficiently detailed for the court to ascertain the reasoning behind the denial of relief to the applicant." *Wheeler v. United States*, 167 Fed. Cl. 345, 349 (2023) (quoting *Keller v. United States*, 113 Fed. Cl. 779, 786–87 (2013), *aff'd*, 565 F. App'x 873 (Fed. Cir. 2014)) (internal quotation marks omitted).

Notwithstanding substantial deference, a military correction board's decision may be set aside by the Court if it is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *See Bader*, 97 F.4th at 909 (quoting *Barnick*,

591 F.3d at 1377) (internal quotation marks omitted).  The Court, however, "lacks the power to grant general equitable relief."  *Flowers v. United States*, 80 Fed. Cl. 201, 221–22 (2008) (citing *Doe v. United States*, 372 F.3d 1308, 1313 (Fed. Cir. 2004)).  Pursuant to the Tucker Act, it may grant limited equitable relief "incident of and collateral to" a monetary judgment.  28 U.S.C. § 1491(a)(2).  Pursuant to 28 U.S.C. § 2507 and RCFC 42(c)(1), the Court may order "an agency to calculate damages in a military pay case."  *Keltner*, 165 Fed. Cl. at 519 (citing *Rogers v. United States*, 26 Cl. Ct. 1023, 1025 (1992); *Laningham v. United States*, 30 Fed. Cl. 296, 316 (1994)).

C.  *Remand as a Remedy*

Under a provision of the Tucker Act and RCFC 52.2, the Court may "remand appropriate matters to any administrative or executive body or official" in adjudicating "any case within its jurisdiction."  A matter may be remanded by the Court "with such direction as it may deem proper and just."  28 U.S.C. § 1491(a)(2).  The Court may remand a matter "on motion or on its own."  RCFC 52.2(a); *see also Meidl v. United States*, 108 Fed. Cl. 570, 573 n.8 (2013).  "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  This Supreme Court precedent, inter alia, is regularly cited in the context of remand in military pay cases.  *E.g.*, *Walls*, 582 F.3d at 1367; *Keltner*, 165 Fed. Cl. at 502; *Nicely v. United States*, 132 Fed. Cl. 649, 652 (2017).  "[I]ntervening events outside of the agency's control" such as "a new legal decision or the passage of new legislation" may justify remand.  *Nicely*, 132 Fed. Cl. at 653 (quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).  Remand may, however, be inappropriate where it would unduly delay the disposition of a case "and serve to only potentially improve [a party's] litigation posture."  *Keltner v. United States*, 148 Fed. Cl. 552, 565 (2020) (citing *Lorion*, 470 U.S. at 744).

## IV.  Analysis

A.  *Differentiation of Issues*

At this stage, the case may be understood in terms of three issues.  Principally, Plaintiff's motion for judgment on the administrative record constitutes an APA-type challenge to the BCNR's decision on remand.  The Court is therefore tasked with determining whether the decision is arbitrary and capricious.  Additionally, there is a dispute between the parties regarding the scope of liberal consideration under the Federal Circuit's decision in *Doyon* whereas the Government, supplementally citing the Vazirani Memo, maintains liberal consideration categorically does not apply to disability retirement determinations.

Plaintiff maintains "the Federal Circuit in *Doyon* already held that both DoD guidance and the relevant statute—10 U.S.C. § 1552(h)—require the BCNR to apply liberal consideration to servicemembers seeking to correct a discharge record to reflect unfitness based on PTSD-related disability[.]"  ECF No. 65 at 2.  Lastly, there is a dispute between the parties regarding whether Plaintiff's service-connected PTSD necessarily deemed him unfit for service with a subsidiary dispute concerning whether the language already associated with his separation may be construed as reflecting unfitness rather than unsuitability.

The Court may readily adjudicate Plaintiff's APA-type challenge at this stage but cannot entertain the equitable relief he requests in conjunction therewith. Granting or denying equitable relief is predicated on the existence of an underlying monetary judgment in such cases whereas fitness determinations for purposes of disability retirement are "not a judicial province," *Heisig*, 719 F.2d at 1156 (footnote omitted), and the BCNR has adversely decided Plaintiff's petition to that end. Accordingly, any monetary judgment at this stage would amount to the Court becoming a "super correction board," which is expressly disapproved of by our precedent.  *Radziewicz*, 167 Fed. Cl. at 66 (quoting *Skinner*, 219 Ct. Cl. at 327) (internal quotation marks omitted).

Whether liberal consideration must be applied to disability retirement, governed by 10 U.S.C. § 1201, is an issue that may be wholly segregated from whether the BCNR's conclusion "[t]here was no error or injustice in [Plaintiff]'s discharge for unsuitability due to a personality disorder" is arbitrary and capricious.  ECF No. 45 at SA0012.

Owing to our precedent concerning deference to correction boards, the Court is ill-positioned to unilaterally determine whether Plaintiff's service-connected PTSD necessarily deemed him unfit for service.

### B.  *The BCNR's Decision on Remand*

It is the Court's conclusion the BCNR's decision on remand is arbitrary, capricious, contrary to law, and unsupported by substantial evidence.

The BCNR's decision relies heavily on the professional qualifications of the mental health providers who diagnosed Plaintiff with personality disorders in 1968 at NHSB and NSTI.  *Id.* at SA0013–14.  It does not account for the fact that PTSD was only recognized as a diagnosis in 1980 by the DSM-III and would not have been diagnostically available to them when they evaluated Plaintiff notwithstanding their presumed expertise and competence.  *Id.* at SA0027.  The BCNR's reasoning thus "fails to consider an important aspect of a problem," *Radziewicz*, 167 Fed. Cl. at 66 (quoting *Royal*, 160 Fed. Cl. at 632–33), and fails to apply liberal consideration under 10 U.S.C. § 1552(h) and the Kurta Memo.

The decision vaguely draws attention to behaviors that apparently informed the personality disorder diagnoses. *Id.* at SA0008, SA0013. The mainstays thereof seem to be Plaintiff having been placed on academic probation prior to enlistment, which the BCNR concedes can be attributed to many causes other than a personality disorder, and difficulty adjusting to the Navy deemed reminiscent of Plaintiff's unspecified conflicts with other organizations prior to enlistment. *Id.* In drawing this conclusion, the BCNR utterly disregards counterevidence, such as the affidavit of Plaintiff's brother, emphasizing and elaborating on his behavioral normalcy pre-enlistment. *Id.* at SA0445–49. Inter alia, Plaintiff's brother describes Plaintiff's mental health struggles as only observable after his separation whereas a personality disorder is necessarily chronic and inflexible. *Id.* The BCNR's reasoning fails to apply liberal consideration and, more generally, "fails to consider an important aspect of a problem" and "offers an explanation for its decision that runs counter to the evidence before the board." *Radziewicz*, 167 Fed. Cl. at 66 (quoting *Royal*, 160 Fed. Cl. at 632–33).

The BCNR disregards the plain meaning of "adequate" in Plaintiff's "semiannual performance evaluation for the period 17 September 1966 through 16 March 1967[,]" ECF No. 45 at SA0004, and does not sufficiently address non-pathological explanations for past behavior such as Plaintiff's attribution of his maladjustment to the Navy to interpersonal conflicts with racially prejudiced shipmates and not merely the Intrepid Four's desertions, *id.* at SA0008, SA0013, SA0253–54. Similarly, its decision notes an inconsistency between Plaintiff's present attribution of his withdrawal from the University of Massachusetts Amherst post-separation to his friend's suicide and his statement in 2014 that "he did not want to do what the teachers wanted as he disagreed with his teachers." *Id.* at SA0008 (internal quotation marks omitted). The latter can be read to imply Plaintiff's initially stated rationale for his withdrawal is probative of a personality disorder. The withdrawal obviously did not have any bearing on his personality disorder diagnoses in 1968 and no suggestion it is probative of a personality disorder has been made by any mental health provider involved in the case. In these respects, the BCNR likewise fails to address a significant aspect of an issue and to apply liberal consideration.

The BCNR cherry-picks evidence from the evaluations conducted by Drs. Leonard and Greenzang in holding Plaintiff's PTSD symptoms *only* began to manifest after the September 23, 1968 airplane crash whereas he had already been duly diagnosed with a personality disorder at NHSB before witnessing the crash. *Id.* at SA0014; *cf. Valles-Prieto*, 159 Fed. Cl. at 618 (holding that a board "failed to consider the entire record because it cherry-picked which evidence to consider[,]" *i.e.*, "failed to consider evidence in the record contrary to its conclusion"). Dr. Leonard attributed Plaintiff's development of PTSD not only to his witnessing the crash but also the *U.S.S. Forrestal* fire on July 29, 1967 whereas he was only admitted to NHSB on August 16, 1968. *Id.* at SA0315. Dr. Leonard noted that

Plaintiff manifested PTSD symptoms after the September 23, 1968 crash but nowhere in her evaluation did she expressly foreclose prodromal indicia of PTSD prior to the crash. *Id.* at SA0319. What's more, she conspicuously noted Plaintiff stated he began inhaling trichloroethylene and attempted suicide sometime after the Intrepid Four's desertions, which took place on October 23, 1967. *Id.* at SA0314. The BCNR therefore conflates the origin of Plaintiff's PTSD and manifestation of clinical symptoms. Dr. Greenzang characterized the September 23, 1968 crash as a mere catalyst, that is, "lightning rod for what [Plaintiff] had been experiencing for more than a year[,]" although he misstated the month and date of the crash as "early August 1968." *Id.* at SA0432–33. Nowhere in his evaluation did he confine Plaintiff's manifestation of PTSD symptoms or otherwise indicia to the period following the crash. Dr. Greenzang, like Dr. Leonard, attributed Plaintiff's development of PTSD to his witnessing both the crash and the earlier *U.S.S. Forrestal* fire. *Id.* The BCNR hence disregards counterevidence and fails to apply liberal consideration.

The BCNR erroneously all but discounts Dr. Greenzang's expertise. *Id.* at SA0014. It appears to cast doubt on his credibility because he was compensated $1000.00 for evaluating Plaintiff and had "no professional obligation for [Plaintiff]'s care[.]" *Id.* In concluding Dr. Greenzang lacked a professional obligation for Plaintiff's care, the BCNR is referring to the fact he conducted an outpatient evaluation of Plaintiff remotely rather than in the course of inpatient services in a psychiatric ward. *Id.* That alone, however, hardly relieved him of a professional obligation. Regardless of whether someone is provided with outpatient or inpatient services, the psychiatrist-patient relationship is akin to the doctor-patient relationship. *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 289–90 (3d Cir. 2002); *see also United States v. Willis*, 778 F. Supp. 205, 209 (S.D.N.Y. 1991) (quoting *Carpenter v. United States*, 484 U.S. 19, 53 (1987)) (internal quotation marks omitted) (holding "[t]he relationship between a psychiatrist and patient has all the characteristics of what the [Supreme] Court calls a paradigmatic fiduciary relationship" in the context of insider trading); *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 438 (1976) ("The role of the psychiatrist, who is indeed a practitioner of medicine, and that of the psychologist who performs an allied function, are like that of the physician who must conform to the standards of the profession and who must often make diagnoses and predictions based upon such evaluations."). As Dr. Greenzang restated, the outpatient evaluation was conducted "[u]sing generally accepted methods in [his] discipline," *id.* at SA0421, and there is no indication he was anything less than a wholly qualified "civilian health care provider," 10 U.S.C. § 1552(h)(2)(A), when he evaluated Plaintiff. The BCNR fails to address counterevidence and also fails to apply liberal consideration in this regard.

## V.     Conclusion

For the foregoing reasons, the Court **SETS ASIDE** the BCNR's decision as arbitrary and capricious.  To the extent it challenges that decision as arbitrary and capricious for failure to apply liberal consideration, Plaintiff's motion for judgment on the administrative record, ECF No. 49, is **GRANTED-IN-PART**.  To the extent it argues remand is an appropriate remedy under such circumstances, the Government's cross-motion, ECF No. 52, is also **GRANTED-IN-PART**.  The Court **REMANDS** to the BCNR pursuant to RCFC 52.2.  On remand, the BCNR shall limit its adjudication of this matter to the issue whether there was error or injustice in Plaintiff's separation for unsuitability due to personality disorder(s).  In doing so, the BCNR shall apply liberal consideration and reach a conclusion not inconsistent with this opinion.  The remand period shall be 60 days, subject to extension on motion.  All proceedings in this case before this Court are **STAYED** for the duration of the remand period.  The Government shall report on the status of the remand proceedings every 30 days, with status reports due on **Wednesday, September 18, 2024** and **Friday, October 18, 2024**.

A certified copy of this opinion and order shall be served on the BCNR by the Clerk of the Court in accordance with RCFC 5.  The copy shall be addressed to:

**Board for Correction of Naval Records**
**701 S. Courthouse Road**
**Building 12, Suite 1001**
**Arlington, VA 22204-2490**

**IT IS SO ORDERED.**

s/ Bohdan A. Futey
**BOHDAN A. FUTEY**
Senior Judge